UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHARLES B. GILL, SR.,

                Plaintiff,

v.                                                Case No. 19-cv-1400-pp

KELLI WEST, JENNIFER MCDERMOTT,
MR. HOCEVAR, TRACY L. THOMPSON,
LORI DOEHLING, TAMI STAEHLER,
LT. MCCLAIN, DOUGLAS HELMRICK,
ANNE M. REILLY, OFFICER HEINON,
OFFICER MURTEN, KATHY SCHMIDT,
CINDY O'DONELL, and BRAD HOMPE,

                Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), SCREENING AMENDED COMPLAINT (DKT. NO. 8) AND REQUIRING THE PLAINTIFF TO FILE A SECOND AMENDED COMPLAINT**

Plaintiff Charles B. Gill, Sr., an inmate at Kettle Moraine Correctional Institution who is representing himself, filed a complaint alleging that the defendants violated his civil rights under 42 U.S.C. §1983. Dkt. No. 1. At the same time, he filed a motion to proceed without prepaying the filing fee. Dkt. No. 2. Seven months later, before the court had screened the original complaint, the plaintiff filed an amended complaint. Dkt. No. 8. This order resolves the motion to proceed without prepaying the filing fee and screens the amended complaint.

**I.    Motion to Proceed without Prepaying the Filing Fee (Dkt. No. 2)**

The Prison Litigation Reform Act applies to this case because the

1

plaintiff was incarcerated when he filed his complaint. 28 U.S.C. §1915. That law allows a court to let an incarcerated plaintiff proceed with his case without prepaying the filing fee if he meets certain conditions. One of those conditions is that the plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b). Once the plaintiff pays the initial partial filing fee, the court may allow the plaintiff to pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

On October 15, 2019, the court ordered the plaintiff to pay an initial partial filing fee of $8.76 by November 5, 2019. Dkt. No. 6. On October 25, 2019, the court received from the plaintiff a motion for leave to pay the initial partial filing fee out of his release account. Dkt. No. 7. But five days later, on October 30, 2019, the court received the $8.76 initial partial filing fee. Because the plaintiff paid the initial partial filing fee, the court terminated as moot his motion for leave to pay that fee out of his release account. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will require him to pay the remainder of the filing fee over time in the manner explained at the end of this order.

**II.     Screening the Amended Complaint (Dkt. No 8)**

As the court noted, the plaintiff filed his original complaint on September 25, 2019. Dkt. No. 1. He filed an amended complaint on April 14, 2020, before the court had screened the original complaint or ordered it served on the defendants. Fed. R. Civ. P. 15(a)(1) says that a party may amend a pleading one

2

time "as a matter of course" if he does so within twenty-one days after serving it or within twenty-one days after the filing of a responsive pleading. Because the court had not yet ordered the original complaint served on the defendants, the plaintiff had a right under Rule 15(a) to amend the complaint without asking the court's permission. Because it is "axiomatic that an amended complaint supersedes an original complaint and renders the original complaint void," Flannery v. Recording Indus. Ass'n of America, 354 F.3d 632, 638 n.1 (7th Cir. 2004) (citation omitted), the court has treated the amended complaint as the operative complaint and has screened the amended complaint.

> A. Federal Screening Standard

Under the Prison Litigation Reform Act (PLRA), the court must screen complaints brought by prisoners seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include

3

"a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B. Allegations in the Amended Complaint

The defendant has sued Kelli West, religious practice coordinator at the Wisconsin Department of Adult Institutions; Jennifer McDermott, who was, at the time, the warden of Kettle Moraine Correctional Institution; Mr. Hocevar, the acting supervisor of the health services unit at Kettle Moraine, nurse

4

practitioner Tracy L. Thompson; nursing coordinator Lori Doehling; correctional program supervisor Tami Staehler; security supervisor Lt. McClain; Complex C supervisor Douglas Helmrick; RN Anne M. Reilly; corrections officer Heinon; corrections officer Murten; Kettle Moraine institution complaint examiner Kathy Schmidt; DOC corrections complaint examiner Brad Hompe; and Cindy O'Donnell, who was at the time the deputy secretary of the Department of Corrections.

    1.  *Allegations Related to Treatment of Migraines*

  The plaintiff alleges that he has suffered from chronic migraines since he was six years old. Dkt. No. 8 at 1. He states that when he arrived at Dodge Correctional Institution (the Wisconsin Department of Corrections' intake facility) in August 2018, he saw a doctor who prescribed him acetaminophen for his migraines. Id. When he arrived at Kettle Moraine, he was still taking acetaminophen. Id. The plaintiff states that he typically received two bottles a month, which came out to forty-eight pills. Id.

  On July 3, 2019, the plaintiff says he started having a severe migraine. Id. He took the acetaminophen as prescribed. Id. He ran out on July 4, 2019 and put in an order form for a new bottle. Id. The plaintiff alleges that on July 5—the next day—he received the order back, denying his request and indicating, "Limit one bottle every two months. 1 bottle issued on 5-8-19 and 1 bottle issued on 6-10-19." Id. The plaintiff reiterates that one bottle held only twenty-four pills, and that he had been getting *two* bottles a month, or forty-

5

eight pills. Id. The plaintiff says that he "suffered a migraine so bad that I could not read, write, sleep, eat or shower, and could hardly focus." Id. He recounts that he "had blurred vision, [his] eyes were sensitive to lights, and [his] head hurt even more with noise. [He] was dizzy and [he] was throwing up." Id.

The plaintiff says that the same day—July 5—he spoke to Sgt. Bowers (not a defendant), who emailed the acting manager of HSU, Mr. Hocevar. Id. at 1-2. The plaintiff says he also wrote "him"—it is not clear whether he means Bowers or Hocevar—on a DOC 761 slip, and put in a medication slip that said, "Need medication ASAP. Have had migraine since 7-3-19." Id. at 2.

On July 6, the plaintiff wrote to Mr. Hocevar on a DOC 761. Id.

The plaintiff states that on July 7, 2019, Nurse N. Schwaller (not a defendant) called him to medical, where she evaluated him, then got permission from the on-call doctor to give the plaintiff "a shot of Toradol." Id. The plaintiff states his migraine finally went away the next day, July 8. Id. The plaintiff says that that same day—July 8—the DOC 761 he'd written to Hocevar was forwarded to Hocevar by the Health Service Unit. Id. He alleges, however, that instead of the slip going to Hocevar, "a Mrs. Lori Doehling responded stating, 'Mr. Gill we are moving up your ACP [Advanced Care Provider] appointment due to the need to review meds.'" Id.

On July 9, the plaintiff used a third DOC 761 slip to write to Hocevar. Id. The plaintiff alleges that Hocevar finally responded on July 15, 2019, stating that "Nurse Zuelger told me that NP Thompson responded back to you

6

regarding your reported migraines." Id. The plaintiff acknowledges that this was true, but he says that what he had written to Thompson "about had nothing to do with what [he] needed to talk to Mr. Hocevar about." Id. He says that his migraines and the refusal of his medication were two different things. Id. He explains that on July 12, he had written to Thompson, asking "why I am only getting one bottle of 24 pills every two months for my migraines." Id. The plaintiff states that on July 15, Thompson responded, "That is how I order it for everyone, if you need more than this then you need further evaluation for medication to prevent headaches." Id. In the amended complaint, the plaintiff asserts that Hocevar "never really did anything to stop the denial of [his] medication." Id.

The plaintiff alleges that on July 11, 2019, "[his] migraine came back with vengeance, same symptoms" as before, and he still had no migraine medication. Id. The plaintiff asserts that he was in "major pain" from July 11 until July 19. Id. He says that on July 12, he sent in a medication refill request sheet but got no response. Id. On July 13, he sent in another refill request sheet, noting that he had "had a migraine since 7-11-19. Put in request yesterday no response, last and final paperwork of any kind." Id.

The plaintiff alleges that on July 14, Nurse Anne M. Reilly denied his medication request and did nothing to stop the pain he was in. Id. The plaintiff asserts that after he was denied his medication, he "again" wrote to Warden Jennifer McDermott; he says that on July 16, she responded, "You filed an

7

Inmate Complaint KMCI-2019-12400 regarding this issue. Please allow the ICRS to finalize the complaint. No action will be taken in regards to this issue by my office." Id. at 2-3. The plaintiff says McDermott did nothing to stop the denial of his medication or to have health services look into why he had no migraine medication or why Reilly refused to give him medication or stop his pain. Id. at 3.

The plaintiff explains that on July 16, he spoke with Doehling, who was the nursing coordinator. Id. While the plaintiff was sitting in Doehling's office with her, he told her that he was having a migraine, but she did nothing to get him medication. Id. The plaintiff alleges that all Doehling did was tell him that she "would move [his] appointment up as soon as possible, and then sent [him] back to [his] unit still in pain and no medication was given." Id. He says that other than taking his vitals, nothing else was done. Id. The plaintiff asserts that he wrote an inmate complaint, KMCI-1-19-12148, in which he complained about his medication being changed from two bottles monthly to one bottle monthly. Id. He says that Deohling stated, "Agree with dismissal. NP did adjust the amount of meds to be issued per month and [the plaintiff] to complete a HA log. (Headache log.) ACP appointment to evaluate treatment plan is scheduled." Id.

The plaintiff states that he was finally seen by Thompson on July 30, but says that this was done "because [he] told her that [he] will be seeing her in court, not because Mrs. Lori Doehling said to." Id.

8

The plaintiff says that Thompson, Hocevar, McDermott, Reilly and Doehling were deliberately indifferent to his medical need because they did nothing when they learned that the plaintiff was in severe pain between July 5 and July 17, 2019 and did nothing to get him medication or to stop the pain. Id. He says that he is suing each of these defendants in their official and individual capacities for violating the Eighth Amendment. Id.

The plaintiff says that on July 15, 2019, inmate complaint examiner Kathy Schmidt received and acknowledged complaint KMCI-2019-12400, for being denied medication for his chronic migraines. Id. at 3-4. He says that at no time was he contracted by Schmidt, but that she recommended on August 1, 2019 that the complaint be dismissed. Id. at 4. He says that on August 5, 2019, Doehling, acting as the reviewing authority, decided to dismiss his inmate complaint; he reminds the court that Doehling saw him on July 16, 2019. Id. The plaintiff alleges that on August 12, 2019, Brad Hompe received and acknowledged his appeal from the dismissal of his complaint. Id. He alleges that Hompe failed to investigate the situation, and that on August 13, 2019, he recommended dismissal of the appeal. Id. The plaintiff avers that on August 16, 2019, Cindy O'Donnell accepted that recommendation and dismissed the appeal. Id. The plaintiff alleges that these individuals failed to remedy the wrong and were deliberately indifferent by failing to act on information about unconstitutional acts. Id.

9

### 2. *Allegations Related to Allowing Plaintiff to Wear Religious Headgear*

On a completely different topic, the plaintiff asserts that around November 11 or 12, 2018, after he arrived at Kettle Moraine, Officer Heinen[1] told the plaintiff that he could not wear his Kufi cap while he was on unit 16; he says that every time Heinen worked she refused to allow him to wear the Kufi cap, even while he was praying. Id. The plaintiff states that on November 13, 2018, he spoke with Mr. Sabish (not a defendant) on Unit 16, who gave him a copy of DAI Policy 309.61.02 and page eighteen of the Kettle Moraine Inmate Handbook regarding headwear. Id. The plaintiff says that Sabish "said that [the plaintiff] had to follow policy, and that Officer Heinon was wrong." Id.

The plaintiff says that the "book" states, "B. Personal religious headwear will be permitted in accordance with Dai Policy 309.61.02 Religious Property." Id. at 5. He asserts, however, that when one reads the "actual policy it does not state anything about religious headwear at all." Id.

The plaintiff asserts that on November 14, 2018, he wrote to McDermott after speaking with Sabish and Sgt. Meinberg (not a defendant.) Id. He says that McDermott responded, "Kufis, Turbans, Kufiyyas, and Yarmulkes are not considered to be 'emblems.'" Id. The plaintiff says that despite this response, McDermott "chose to do nothing about this restriction, and yet there [was] a restriction on [his] wearing [his] kufi." Id.

---

[1] In the section of the original complaint where he identified the defendants, the plaintiff spelled this officer's name "Heinon." Dkt. No. 1 at 3.

The plaintiff states that he filed Inmate Complaint KMCI-2018-24639. Id. The plaintiff asserts that after he lost the appeal of this complaint, he wrote to Ms. Staehler "asking for a DOC-2075," but he says it "was never answered." Id. He says that on June 25, 2019, he asked her for a second DOC-2075. Id. The plaintiff says that he "turned it in on June 28th, 2019," but that he has heard nothing back. Id. He asserts that Staehler "refuses to call Madison to see what's going on with [his] DOC-2075 form." Id. He asserts that Native Americans are allowed to wear their medicine bags around their necks on top of their clothes, that Catholics can wear their rosary beads around their necks on top of their clothes, but that "us as Muslims cannot wear our Kufis." Id.

The plaintiff tells the court that he sincerely believes that a Kufi must be worn at all times. Id. He converted to Islam in 1994 and has practiced his faith for twenty years. Id. The plaintiff concedes that while he is working or on a contact visit, "yes the Kufi will come off and be left with [his[ Qur'an in [his] cell," but he says that at all other times, the Kufi should be on his head. Id. He asserts that it is "part of Islamic and Judaism to wear head coverings at any time." Id. He asks why, if "everyone else" can wear baseball caps (green or gray) or knitted caps (green, gray or "the blue ones issues by KMCI upon arrival), he can't wear his Kufi. Id.

The plaintiff alleges that since November of 2019, Officer Murten has harassed him on his way to and from Jumah services. Id. He says Murten has stopped him and directed him to take off his Kufi. Id. The plaintiff says that

11

when he has carried the Kufi in his hand, Murten has directed him to put it in his pocket. Id. The plaintiff says there are time he doesn't even have pockets, and Murten still harasses him to cover up his Kufi. Id. The plaintiff says he has told Murten many times that Murten is violating his religious rights, but that Murten says, "I am not. Per DAI Policy religious emblems are not to be seen." Id. The plaintiff asserts, however, that a Kufi is not a religious emblem. Id. He claims that the federal Bureau of Prisons allows prisoners to wear religious headgear and that he learned from Staehler that a federal judge had ordered the Wisconsin Secure Program Facility to allow inmates to wear religious headgear. Id. at 5-6. He says inmates at Boscobel are allowed to wear religious headgear and that a magistrate judge has allowed inmates who practice Odinim to wear their Hlath. Id. at 6. The plaintiff says that on August 14, 2019, he wrote to religious coordinator Kelli West, but that she still has yet to reply. Id. He indicates that this was his second letter to West without answer, and says he is suing the defendants in their official and individual capacities. Id.

The plaintiff identifies nine defendants as people who "hold positions of Supervisors or higher"—West, McDermott, Hocevar, Thompson, Doehling, Staehler, Schmidt, Hompe and O'Donnell. Id. He says that because these people are supervisors, and "being that their actions or lack of actions was done while active in that position, and violated [his] constitutional rights in one way or another," he wants to "move on a Supervisor Liabilitly Claim" against each of them. Id.

12

The plaintiff also asserts that he has used the inmate grievance process, filing KMCI-2019-12148, KMCI-2019-12400 and KMCI-2018-24639. Id. at 7. He says that he presented the relevant facts, was told the grievances had been denied and appealed those denials. Id.

### 3. *The Original Complaint*

In the original complaint, the plaintiff also alleged that certain prison officials searched through his legal materials. Dkt. No. 1 at 8-9. He did not repeat that claim in the amended complaint, and because the amended complaint supersedes the original complaint, that claim is not before the court. In the original complaint, the plaintiff also requested money damages for each of the three claims and injunctive relief as to the religious headgear claim and the illegal removal of evidence claim. Id. at 12. The plaintiff has not repeated those requests in his amended complaint.

### C. Analysis

The court first notes that both the original and the amended complaints made allegations against Ted Hocevar, who was the acting manager of the health services unit at Kettle Moraine Correctional Institution. On July 6, 2020, however, the clerk's office received a letter from the plaintiff, asking to remove Hocevar as a defendant because it had come to the plaintiff's attention that "his involvement was not what [the plaintiff] had thought it was." Dkt. No. 9. Because the plaintiff no longer wishes to proceed against Hocevar, the court will dismiss him as a defendant.

The amended complaint states at least two separate, distinct and unrelated claims against different sets of defendants. While a plaintiff may bring multiple claims against a single party in a single complaint, a plaintiff cannot bring *unrelated* claims against different defendants in a single case. George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007); Fed. R. Civ. P. 18(a) and 20(a)(2). A plaintiff may join multiple defendants in a single case only if the plaintiff asserts at least one claim against each defendant that arises out of the same events and involves questions of law or fact that apply to all the defendants. Fed. R. Civ. P. 20(a)(2); George, 507 F.3d at 607; Wheeler v. Wexford Health Sources, Inc., 689 F.3d 680, 683 (7th Cir. 2012) (stating that joining multiple defendants in one case "is limited to claims arising from the same transaction or series of related transactions").
 case.

The amended complaint violates Rules 18 and 20 because it brings unrelated claims against multiple defendants. In the first part of the amended complaint, the plaintiff brings claims of deliberate indifference to medical needs under the Eighth Amendment and a medical malpractice claim under state law against Thompson, McDermott, Reilly and Doehling. This section alleges that these defendants were deliberately indifferent in their response (or lack of response) to migraines he suffered in July 2019. The next section of the complaint alleges that Schmidt, Doehling, Hompe and O'Donnell failed to remedy the violations committed by the first set of defendants and were

14

deliberately indifferent by failing to act on his inmate grievances. The third section alleges that defendants Heinon, McDermott, Staehler, Murten and West violated his religious rights between November 2018 and June 25, 2019. The fourth section asks to proceed against West, McDermott, Thompson, Doehling, Staehler, Schmidt, Hompe and O'Donnell on a "supervisory liability claim."

The complaint involves a medical claim against one set of defendants for events that occurred in the summer of 2019. It involves another claim against complaint examiners for denying the plaintiff's grievances later that summer. It involves yet another claim against different defendants for religious practice violations in the fall of 2018 through early summer 2019. The only thing these claims have in common is that all the defendants worked for the Wisconsin Kettle Moraine while the plaintiff was in custody there.

The court cannot allow the plaintiff to proceed on the amended claim as it stands; it must divide up the claims by "either by severing the action into separate lawsuits or by dismissing the improperly joined defendants." Owens v. Hinsley, 635 F.3d 950, 952 (7th Cir. 2011) (citing Fed. R. Civ. P. 21). Rather than making the decision for the plaintiff, however, the court will give him an opportunity to choose which claim he wants to proceed with in this case. The court will give the plaintiff a deadline by which to file a second amended complaint that focuses on one of the claims. The plaintiff may bring the other claims in separate lawsuits, if he wishes to do so.

The court notes a few things. First, as to the plaintiff's assertion that he

15

wants to sue nine defendants for supervisory liability, "an individual must be personally responsible for a constitutional deprivation in order to be liable" under §1983. Childress v. Walker, 787 F.3d 433, 439 (7th Cir. 2015). If someone has a constitutional duty to the plaintiff and acts, or fails to act, with deliberate or reckless disregard of the plaintiff's rights, that person may be liable under §1983. Id. at 440 (citing Brokaw v. Mercer Cty., 235 F.3d 1000, 1012 (7th Cir. 2012). A supervisor can be held liable under §1983 "if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent." Id. But to hold a supervisor liable, a plaintiff must show something more than that the defendant was a supervisor; "[l]iability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." Burks v. Raemisch, 555 F.3d 592, 593-94 (7th Cir. 2009). The plaintiff must show that the supervisor had knowledge of the unconstitutional actions of his or her staff and turned a blind eye or ignored it or approved of it. The plaintiff should keep this in mind if he decides to pursue any of the claims that involve supervisors.

Second, the plaintiff sues the inmate complaint examiners and reviewers because they dismissed his inmate grievances. If the plaintiff chooses to pursue this claim, he should be aware that "[p]rison grievance procedures are not mandated by the First Amendment and do not by their very existence create interests protected by the Due Process Clause, and so the alleged mishandling of [an inmate's] grievances by persons who otherwise did not cause or

16

participate in the underlying conduct states no claim." <u>Owens</u>, 635 F.3d at 953; <u>see also</u> <u>George</u>, 507 F.3d at 609.

Third, the plaintiff implies that the complaint examiners and some supervisors had some kind of duty to fix the issues with his headaches and his medication. But "[p]ublic officials do not have a free-floating obligation to put things to rights . . . ." <u>Burks</u>, 555 F.3d at 595. "The Governor, and for that matter the Superintendent of Prisons and the Warden of each prison, is entitled to relegate to the prison's medical staff the provision of good medical care. That is equally true for an inmate complaint examiner." <u>Id.</u> (citing <u>Durmer v. O'Carroll</u>, 991 F.3d 64 (3d Cir. 1993); <u>Johnson v. Doughty</u>, 433 F.3d 1001, 1011 (7th Cir. 2006).

The court is enclosing a copy of its complaint form and instructions. The plaintiff must write the words "Second Amended" at the top of the first page next to the word "Complaint." He must put the case number for this case—19-cv-1400—in the space provided for the case number. He must select the one set of defendants and claims upon which he wants to proceed in this case and must list in the caption of the complaint on the first page only those defendants involved in that claim. He should use the spaces on pages two and three to allege the key facts that give rise to the claims he wishes to bring, and to describe which defendants he believes committed the violations that relate to each claim; if he wants, he can simply copy into the second amended complaint the facts he alleged in the amended complaint. If there is not enough

17

space on pages two and three under "Statement of Claim" for the defendant to lay out the facts, he may use an additional piece of paper. He should explain at the end of the complaint the relief he is requesting.

If the court receives the second amended complaint by the deadline the court sets below, the court will screen that second amended complaint and decide whether it states a claim. If the court does *not* receive the second amended complaint by the deadline the court sets below, it will select one of the claims the defendant has alleged in the amended complaint and will dismiss the other claims.

## IV. Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **ORDERS** that defendant Ted Hocevar is **DISMISSED**.

The court **ORDERS** that if the plaintiff chooses to file a second amended complaint that complies with the instructions in this order, he must do so in time for the court to *receive* it by the end of the day on **November 27, 2020**. If the court does not receive the second amended complaint by the end of the day on November 27, 2020, the court will select one of the claims for the plaintiff and will dismiss the others.

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the **$341.24** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an

18

amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the officer in charge of the agency where the plaintiff is confined.

The court **ORDERS** that plaintiffs who are inmates at Prisoner E-Filing Program institutions must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are inmates at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the

19

clerk of court of any change of address. Failure to do so could result in orders or other information not being timely delivered, which could affect the legal rights of the parties.

Dated in Milwaukee, Wisconsin this 22nd day of October, 2020.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**